## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

RARITAN BAYKEEPER, INC. (d/b/a NY/NJ
BAYKEEPER),

           Plaintiff,

v.

SOUTH SHORE RECYCLING LLC and JULIA
COLUCCIO,

           Defendants.

---------------------------------------------------------------

Case No. 21-5701

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiff Raritan Baykeeper, d/b/a NY/NJ Baykeeper ("Baykeeper"), by and through its counsel, hereby alleges:

## I.

## INTRODUCTION

1.     This action is brought under the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act"), to address and abate Defendants' ongoing and continuous violations of the Act.

2.     Defendants discharge polluted industrial stormwater from a construction and demolition ("C&D") debris processing and recycling facility located at 327 Industrial Loop, Staten Island, NY 10309 (the "Facility") into the Arthur Kill and adjacent wetlands in violation of CWA Sections 301(a) and 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New York State Department of Environmental Conservation ("DEC") SPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity, Permit No. GP-0-17-004 (March 1, 2018), https://www.dec.ny.gov/docs/water_pdf/msgp017004.pdf ("General Permit").

3.     Defendants' violations of the General Permit and the Clean Water Act include inadequate pollution control measures and pollution prevention plan and the release of pollutants that contribute to violations of water quality standards in the Arthur Kill.

4.     Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted stormwater pour into the Arthur Kill and other receiving waters in this District.  The State of New York has designated as "impaired" more than 7,000 river miles; 319,000 acres of larger waterbodies; 940 square miles of harbors, bays, and estuaries; 10 miles of coastal shoreline; and 592 miles of Great Lakes shoreline.  Under the Clean Water Act, "impaired" means not meeting a state's water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation.  In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded.  For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

5.     The Arthur Kill is one of these impaired waterbodies.  New York State has determined that the Arthur Kill does not meet state water quality standards for a number of pollutants including garbage and refuse, dioxin, PCBs, and other toxins such as various metals. Most importantly here, the Arthur Kill does not meet state water quality standards for dissolved oxygen.  Dissolved oxygen is essential to all aquatic life – without it, aquatic organisms die and ecosystems collapse.

6.     Defendants' stormwater discharges contribute to this endemic stormwater

pollution problem.  Defendants engage in industrial activities such as the sorting and processing

of construction and demolition debris and materials recycling.  As precipitation comes into

contact with pollutants generated by these industrial activities, it conveys those pollutants to

nearby waters.  Contaminated stormwater discharges such as those from the Facility can and

must be controlled to the fullest extent required by law in order to allow these water bodies a

fighting chance to regain their health.

## II.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over the parties and this action pursuant

to CWA Section 505(a)(1) (the citizen suit provision of the CWA), 33 U.S.C. § 1365(a)(1), and

28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is

authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual

controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b),

1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

8.     On June 3, 2021, Plaintiff provided notice of Defendants' violations of the Act

and of its intention to file suit against Defendants to Defendants; Defendants' registered agent;

the Administrator of the United States Environmental Protection Agency ("EPA"); the

Administrator of EPA Region II; and the Commissioner of the New York Department of

Environmental Conservation ("DEC"), as required by the Act under CWA Section 505(b)(1)(A),

33 U.S.C. § 1365(b)(1)(A), and the corresponding regulations at 40 C.F.R. §§ 135.1 to 135.3.  A

true and correct copy of Plaintiff's notice letter is attached as Exhibit A, and is incorporated by

reference.

9.     More than sixty days have passed since the notice letter was served on Defendants and the State and federal agencies.  Plaintiff has complied with the Act's notice requirements under CWA Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

10.    Neither the EPA nor the State of New York has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this complaint.  *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

11.    This action is not barred by any prior administrative penalty action under CWA Section 309(g), 33 U.S.C. § 1319(g).

12.    Venue is proper in the United States District Court for the Eastern District of New York pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

## III.

## PARTIES

13.    Plaintiff RARITAN BAYKEEPER, INC. d/b/a NY/NJ BAYKEEPER ("Baykeeper") is a non-profit corporation, whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hudson-Raritan Estuary through enforcement, field work, and community action.  Baykeeper's mission includes safeguarding the environmental, recreational and commercial integrity of the Hudson River Estuary and its ecosystem, as well as the watersheds of the Raritan Bay and Lower Raritan River.  Baykeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums.  To further its mission, Baykeeper actively seeks federal and state implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

14.     Baykeeper has approximately 350 members in the New York and New Jersey region, many of whom use and enjoy the waters of the New York Harbor—including the Arthur Kill, which is polluted by industrial stormwater runoff from Defendants' Facility.

15.     Plaintiff's members reside near to, use and enjoy the waters which are polluting. Plaintiff's members use those areas to fish, crab, sail, boat, canoe, kayak, swim, birdwatch, photograph, observe wildlife, study nature and the sciences, and engage in spiritual and religious practices, among other activities.  Defendants' discharges of stormwater associated with industrial activity containing pollutants impair each of those uses.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the General Permit.

16.     For example, one Baykeeper member is an active swimmer, fisher, crabber, boater, and wildlife enthusiast in and around the waterways of Staten Island.

17.     Although this member used to enjoy swimming in Staten Island's waterways, he stopped swimming upon learning of the pollutants that are in the water and further unknown contaminants from polluted discharges.  This pollution worries him and has hindered his enjoyment of these waterways.  If the waterways were rehabilitated, he would happily resume swimming in the natural waterways of Staten Island.

18.     This member also fishes in these waterways on a weekly basis.  He used to eat the fish he caught, but now only does catch-and-release out of concern for the pollutants these fish may contain.

19.     This member has also observed families crabbing in this area.  Although he told them of the water quality concerns and advised them not to eat the crabs, he observed them removing the crabs for consumption.  He is therefore worried about the health and safety of the

people in his local community because of the pollution in the waterways of Staten Island.

20.     This member canoes or kayaks the Arthur Kill and its tidal tributaries (including Old Place Creek, Saw Mill Creek, Neck Creek, and Fresh Kills) about once per month, a habit he intends to continue for the foreseeable future.  He does this for personal enjoyment and to assist the water quality protection organizations of which he is a member, including Baykeeper.

21.     While canoeing or kayaking, he observes the health of the local ecosystem and makes note of any pollution problems, and also actively engages in wildlife observation and photography.  He cares about that wildlife and the natural areas in his community that depend on clean water from the Arthur Kill and its tidal tributaries.

22.     If Defendants are forced to reduce their pollution, it would lead to a cleaner Arthur Kill; less harm to the wildlife and natural areas that Baykeeper's aforementioned member cares about; protection of the members of his local community; and his personal greater enjoyment of his local waterways and natural areas near and around the Arthur Kill and its tidal tributaries.

23.     If Defendants are not required to comply with the terms of their General Permit and reduce their pollution, Baykeeper's member's enjoyment of the Arthur Kill and its tidal tributaries will continue to be impaired.

24.     For these reasons, this member is personally harmed by the pollution created during the operation of Defendants' facility in violation of the terms of the General Permit.

25.     The relief sought herein will redress the harms to Plaintiff and its members caused by Defendants' activities.  Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which harm they have no plain, speedy, or adequate remedy at law.

26.     Baykeeper brings this action on behalf of itself and its members.  Baykeeper's interest in reducing Defendants' discharges of pollutants into the Arthur Kill and requiring Defendants to comply with the requirements of the General Permit are germane to Baykeeper's purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Baykeeper.

27.     Baykeeper is informed and believes, and thereupon alleges, that Defendant South Shore Recycling LLC is a limited liability corporation incorporated under the laws of the State of New York, that owns and/or operates the Facility.

28.     Baykeeper is informed and believes, and thereupon alleges, that Defendant Julia Coluccio is and was at all relevant times a natural person and citizen of the State of New York who is the responsible corporate officer, a manager, and the registered owner for South Shore Recycling LLC.


## IV.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

29.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  CWA § 101(a), 33 U.S.C. § 1251(a).  In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

30.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System

("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.  A NPDES permit requires dischargers of pollution to comply with various limitations.

31.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive requirements of the CWA.  CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

32.     In New York, DEC has been delegated the authority to issue NPDES permits. Such state-issued permits, issued by DEC pursuant to its delegated authority from EPA under the Clean Water Act, are referred to as State Pollutant Discharge Elimination System ("SPDES") permits.  SPDES permits are tantamount to "State" NPDES permits and have the same legal effect as NPDES permits.

33.     The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution.  *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

34.     The Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants, permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants . . . ."  33 U.S.C. § 1311(b)(2)(A) (i.e., the "BAT" standard).  The Act also sets a different standard, "application of the best conventional pollutant control technology" for a

defined set of five "conventional pollutants."  *Id.* § 1311(b)(2)(E)[1] (i.e., the "BCT" standard) (together, the "BAT/BCT standard").  *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

35.     The Clean Water Act further requires any NPDES permit issued by a state to contain any additional limits necessary to ensure compliance with that state's water quality standards.  *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards"), 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).  *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

36.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

37.     Pursuant to CWA Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26.  In promulgating those regulations, EPA cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation.  In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants.  55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

---

[1] "Conventional pollutants" are defined by statute, 33 USC 1314(a)(4), and by regulation, 40 CFR 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

38.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

### New York's General Permit for the Discharge of Stormwater Associated with Industrial Activity

39.     As a delegated state NPDES permitting agency, DEC has elected to issue a statewide general permit for industrial stormwater discharges in New York.  *SPDES Multi-Sector General Permit For Stormwater Discharges Associated With Industrial Activity*, Permit No. GP-0-17-004, N.Y. DEP'T ENVTL. CONSERVATION (Mar. 1, 2018) ("General Permit").  DEC also has the authority to issue SPDES permits for individual applicants.

40.     As a state-issued, delegated NPDES permit, the General Permit requires permittees to use measures that reflect, and prohibits the discharge of pollutants above the level commensurate with, application of the BAT/BCT standard.  *See* General Permit, Part II (requiring permittees to minimize pollution by adopting measures that are "technologically available and economically practicable and achievable in light of best industry practice").

41.     Furthermore, as a state-issued, delegated NPDES permit, the General Permit prohibits permittees from causing or contributing to violations of water quality standards.  *See* General Permit, Part II.C.1.a ("It shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705."); *Id.*, Part II.C.1.c ("In all cases, any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited.").

### The General Permit Framework

42.     The General Permit ensures compliance with federal technology and water-quality based requirements by imposing a variety of conditions.  All of the General Permit's

conditions constitute enforceable "effluent standards or limitations" within the meaning of the CWA's citizen suit provision.  33 U.S.C. § 1365(f) (defining enforceable effluent standards or limitations to include "a permit or condition of a permit issued under section 1342 of this title").

43.     At the outset, the General Permit establishes eligibility conditions that permittees must meet to obtain coverage.  General Permit, Part I.  Permittees apply for coverage under the General Permit by submitting an application called a Notice of Intent.  *Id.*, Part I.D.

44.     Among other things, when submitting a Notice of Intent, the applicant must identify the specific outfalls through which it will discharge industrial stormwater.  A permittee may only lawfully discharge stormwater associated with industrial activity from these outfalls.  *Id.*, Parts I.D.3, I.F.

45.     Next, the General Permit contains a variety of substantive limits that all permittees must meet.  *Id.*, Part II.  These include numeric effluent limitations on the quantity and concentration of pollutants, narrative effluent limitations on pollutants, and compulsory pollution control and minimization practices.  *Id*.

46.     In addition, the General Permit contains effluent limitations that apply only to permittees engaged in particular industrial activities.  *See id*., Part VII.

47.     The General Permit implements the BAT/BCT standard through a combination of general and sector-specific effluent limitations that require the Facility to "minimize" the discharge of pollutants.  *See id*., Part II; Part VII.  The General Permit defines "minimize" as requiring operators to "reduce and/or eliminate to the extent achievable using control measures [including best management practices ("BMPs")] … that are technologically available and economically practicable and achievable in light of best industry practice."  *Id*., Part II.  BMPs include changes to industrial practices and activities (for example, annual employee training

programs) and structural changes to the property (for example, collection basins that reduce stormwater discharged from a facility).

48.     As noted above, the General Permit also implements the Clean Water Act's water quality-based protections: it prohibits any discharge that may cause or contribute to a violation of New York's water quality standards as contained in 6 NYCRR Parts 700-705.  *Id*., Water Quality Based Effluent Limitation II.C.1.a.  Water Quality Based Effluent Limitation II.C.1.c of the General Permit holds that "any discharge which contains a visible sheen, foam, or odor, or may cause or contribute to a violation of water quality is prohibited."

49.     Permittees typically meet the General Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting "best management practices" ("BMPs") and other stormwater control measures.  BMPs and control measures include changes to industrial practices and activities (for example, housekeeping schedules and employee training programs) and structural improvements (for example, roofing to minimize exposure of pollutants, or collection basins that reduce the volume of stormwater discharged from the facility).

50.     The permittee must select, design, install, and implement control measures, including BMPs, in accordance with good engineering practices, to meet the effluent limits contained in the General Permit.  *See, e.g.*, *Id*., Part II (outlining mandatory BMPs), Part VII (outlining sector-specific BMPs), Part III.A.7 (requiring documentation of all BMPs installed and implemented at the facility pursuant to Parts II and VII, documentation of all innovative BMPs, and an explanation of any BMPs that have not been installed due to site-specific conditions).

51.     The General Permit sets forth additional non-numeric effluent limits requiring

particular BMPs based on the type of industrial activities occurring at a particular facility (the "sector").  *See id*., Part VII.

52.     A permittee must record the BMPs and control measures used to meet the General Permit's limits in a "stormwater pollution prevention plan" ("SWPPP").  *Id*., Part III.  The permittee must develop, implement, and continually update this plan to adapt it to changing conditions at the facility.  The SWPPP must address all of the permittee's industrial activities and meet all other requirements for such plans set forth in the General Permit.  Further the SWPPP must be developed and fully implemented before an applicant is eligible to discharge industrial stormwater under the General Permit—a fully implemented SWPPP is a precondition of coverage.  *Id*., Part I.D.1.a.

53.     To ensure compliance, adequacy, and functioning of the SWPPP and selected BMPs, permittees must track, improve upon, and report upon their performance under the General Permit.  *See Id*., Parts IV–VII.

54.     The General Permit requires regular inspections by qualified personnel, including annual comprehensive inspections and quarterly routine inspections, to evaluate the performance and maintenance needs of BMPs, detect leaks, and document any deficiencies in the implementation and/or adequacy of the SWPPP, amongst other things.  *Id*., Parts IV.A–C; *see also id.* Parts II.A.2–3.

55.     The General Permit also requires monitoring of stormwater discharges, including quarterly visual monitoring and periodic sampling for pollutants associated with the facility's industrial sector.  *Id*., Parts IV.D–G, VII.  The General Permit relies centrally on comparing the pollution found in a permittee's stormwater to "benchmark monitoring cutoff concentrations" (benchmarks) for each pollutant to ensure that permittees are minimizing pollution and

complying with the narrative limits set forth in the General Permit.  *See id.*, Part VII (adopting sector-specific benchmarks for each category of permittees).

56.     A benchmark is "a guideline for the owner or operator to determine the overall effectiveness of the SWPPP in controlling the discharge of pollutants to receiving waters." *Id.*, Appendix A.  As the EPA explained in adopting benchmarks originally, they "provide a reasonable target for controlling storm water contamination by pollution prevention plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995).  Further, benchmark exceedances can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish."  *Id*. at 50824–25.

57.     Thus, the benchmarks provide strong evidence of whether a facility has implemented adequate control measures and BMPs to comply with the General Permit and the federal technology and water-quality based standards that it implements.  Although compliance with benchmarks under the General Permit is self-reported, self-monitoring reports under the General Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988), vacated on other grounds, 485 U.S. 931 (1988).

58.     If an inspection or monitoring sample reveals an exceedance, violation, or other issues with the BMPs or the SWPPP, the permittee is required to take and document corrective actions.  General Permit, Part V.

59.     The results of a permittee's inspections and monitoring must be documented and kept with the SWPPP, and certain reports must be submitted to DEC on a periodic basis. General Permit, Part VI.  This self-reporting is the primary means by which DEC and EPA ensure a facility complies with the General Permit and the Clean Water Act.

**Key Conditions of the General Permit**

60.     Within that framework, the following specific conditions of the General Permit are particularly relevant in this case.

Effluent Limitations and Requirement for Adequate Control Measures

61.     In order to minimize pollution, the General Permit requires permittees to keep clean all exposed areas that are potential sources of pollutants.  General Permit, Part II.A.2.

62.     The General Permit requires permittees to sweep or vacuum exposed areas at regular intervals; store materials in containers; keep dumpsters lidded at all times; and prevent the introduction of floatable debris in surface waters of the state by keeping exposed areas clear of waste and intercepting waste.  *Id*., Part II.A.10.

63.     The General Permit requires permittees to minimize off-site tracking of materials to prevent pollution.  *Id*., Part II.A.11.

64.      The General Permit prohibits any discharge that may cause or contribute to a violation of New York's water quality standards.  *Id*., Part II.C.1.c.

65.     For facilities in Sector N, the General Permit establishes the following benchmarks: TSS – 100 mg/L, chemical oxygen demand ("COD") – 120 mg/L, O&G – 15 mg/L, total recoverable aluminum – 750 µg/L, total recoverable cadmium – 1.8 µg/L, total chromium – 1.8 mg/L, total recoverable copper – 12 µg/L, total recoverable iron – 1 mg/L, total recoverable lead – 69 µg/L, and total recoverable zinc – 110 µg/L.

66.     For water bodies with a designation of Class SD, Table 1 of 6 NYCRR Section 703.5 provides the following water quality standards for pollutants that are discharged from the Facility: copper – 4.8 µg/L (Aquatic (Acute)) ("A(A)"); lead – 204 µg/L (A(A)); zinc – 95 µg/L (A(A)).

SWPPP Requirements

67.     Defendants' SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with industrial activity.  Further, the SWPPP must describe and ensure the implementation of practices that minimize the discharge of pollutants in these discharges and that assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.  General Permit, Part III.A.

68.     The General Permit provides detailed instructions to ensure the SWPPP "documents the practices and procedures [necessary] to ensure compliance with the conditions of th[e General Permit], including the selection, design, installation and maintenance of control measures selected to meet effluent limitations in Parts II and VII."  *Id.*, Part III.

69.     Among other things, the SWPPP must include: information related to a discharger's stormwater pollution prevention team; a general site description; a summary of potential pollutant sources; measures related to handling of spills and releases; a general location map and a site map identifying the location of the facility and all receiving waters to which stormwater discharges; a description of control measures and best management practices; schedules and procedures for implementation of control measures, monitoring and sampling, and inspections; and documentation of inspections, samples, and corrective actions taken at a facility.

70.     The General Permit also includes sector-specific SWPPP requirements.  For facilities in Sector N (including Subsector N3), these requirements include, *inter alia*, a program to control materials received for processing; BMPs to minimize contact of particulate matter stored indoors or under cover from contacting surface runoff; BMPs to minimize contact of stormwater runoff with stockpiled materials, processed materials, and non-recyclable wastes; BMPs to minimize contact of residual liquids and particulate matter from materials stored

indoors or under cover from coming in contact with surface runoff; a program to control what is received at the facility; measures necessary to minimize contact of surface runoff with residual cutting fluids; BMPs to minimize surface runoff from coming in contact with scrap processing equipment; and measures to minimize stormwater contamination at loading/unloading areas. *Id.*, Part VII.N.

71.    For facilities discharging to impaired waterbodies for which the cause of the impairment is a pollutant of concern included in the benchmarks as set forth in Appendix G of the General Permit, a facility must contain the following SWPPP requirements: identification of the impaired waterbody, a list of pollutants of concern that could be discharged causing the impairment, an identification of each area of the facility that generates stormwater discharges associated with industrial activity that creates a reasonable potential to discharges the pollutants of concern, and specific BMPs to minimize the pollutant of concern from being discharged to the impaired waterbody. *Id.*, Part III.D.2.a-d.

<u>Monitoring and Reporting</u>

72.    The General Permit requires operators to collect and analyze samples of industrial stormwater discharges resulting from measurable storm events from every outfall at a facility. The General Permit requires such sampling and analysis to occur twice per year. *Id.*, Parts IV and VI.

73.    The General Permit requires that facilities discharging stormwater to impaired waterbodies conduct additional monitoring.  Facilities in Sector N3 that are discharging to waters impaired for low dissolved oxygen are required to conduct quarterly monitoring of stormwater discharges. *Id.*, Parts IV.F.1.c, IV.F.2, Appx. G.

74.    The General Permit requires that facilities that have an exceedance of a numeric

effluent limit, or an exceedance of a benchmark cut-off concentration for a pollutant of concern

to an impaired waterbody (i.e. a pollutant that is associated with the impairment), must report the

results of the exceedance(s) and the corrective action(s) taken on a Corrective Action form along

with the submission of the DMR reporting that exceedance. *Id.*, Parts VI.A.2.b, VI.B (Table

VI.1).

75.     The General Permit also requires permittees to conduct regular inspections of the

facility and monitoring of stormwater discharges to ensure the BMPs and SWPPP are effectively

minimizing the discharge of pollution through stormwater. *Id.*, Part IV.  If deficiencies are

identified, corrective actions must be taken and documented. *Id.*, Part V.  Reports of these

procedures must be kept with the SWPPP, and certain reports must be submitted to DEC. *Id.*,

Part VI.

Corrective Actions

76.     The General Permit requires "corrective actions" to improve BMPs when, *inter*

*alia*, "the benchmark or numeric effluent limit [stormwater] sample results indicate exceedances

of the pollutants." *Id.*, Part V.A.  A discharger must implement additional structural and non-

structural BMPs to prevent a recurrence of those exceedances within 12 weeks. *Id.*, Part V.A.1.

If the exceedances still continue, the discharger must continue implementing additional BMPs.

*Id.*, Part V.A.4.  Corrective actions are also required if there is evidence indicating that

stormwater discharges "are causing, have the reasonable potential to cause, or are contributing to

a violation of the water quality standards." *Id.*, Part II.C.1.b.  A failure to take the necessary and

required corrective actions is a violation of the permit. *Id.*, Parts V, II.C.1.b.

**Beneficial Uses of New York Surface Waters**

77.     The DEC has classified the portion of the Arthur Kill where the Facility

discharges as a Class SD water.  6 N.Y.C.R.R. § 890.6.

78.     Under New York's Water Quality Standards, a waterbody that is designated as SD is meant to be suitable for fishing and for fish, shellfish, and wildlife survival as well as for potential use for primary and secondary contact recreation.  6 N.Y.C.R.R. § 701.14.

79.     The New York Water Quality Standards also set numeric and narrative criteria for different water pollution parameters including dissolved oxygen, oil and grease, suspended and settleable solids, bacteria (pathogens), pH, temperature, nutrients, and others.  *See generally* 6 N.Y.C.R.R. §§ 702, 703.  A waterbody must meet these numeric and narrative criteria in order to support its designated uses.  *See id*. §§ 702.2, 702.9.

80.     The DEC has designated the Arthur Kill as impaired pursuant to CWA Section 303(d) for failure to meet minimum water quality standards for a number of pollutants, including garbage and refuse, low dissolved oxygen, dioxin, PCBs, and other toxins such as various metals.  *Section 303(d) List of Impaired Waters Requiring a TMDL/Other Strategy*, N.Y. DEP'T ENVTL. CONSERVATION, 7, 16 n.5, 17 & 30 (June 2020).

## CWA Citizen Enforcement Suits

81.     Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action in federal court on his own behalf against any person who is alleged to be in violation of an "effluent standard or limitation" under the CWA.

82.     Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a), includes an action seeking remedies for an unpermitted discharge in violation of CWA Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.  CWA Section 505(f), 33 U.S.C. § 1365(f).

83.     Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting U.S. courts the authority to issue declaratory relief in case of actual controversy and grant further necessary relief based on such a declaration).

84.     Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

85.     Violators of the Clean Water Act are also subject to an assessment of civil penalties of up to $56,460 per day per violation.  CWA §§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

## V.

## STATEMENT OF FACTS

### The Facility and Stormwater

86.     Defendant owns and/operates the Facility, a construction and demolition debris processing and recycling facility located in Staten Island, NY.

87.     The Facility is classified under Standard Industrial Classification ("SIC") Code 5093, meaning that it is primarily engaged in the assembling, breaking up, sorting, and wholesale distribution of waste materials.  Activities in this SIC Code are subject to the General Permit's effluent limits for industrial Sector N.

88.     Within Sector N, the General Permit further divides recycling facilities into various sub-sectors, labeled N1 to N5, based on the kinds of recycling activities that occur on site and the potential of those activities to release pollution.  The Facility is a Sector N3 facility.  A Sector N facility must comply with all of the General Permit's universal requirements, all requirements that apply to every Sector N facility, and all requirements that apply to any of the subsectors that describe the facility's recycling activities.

89.     The Facility collects and discharges stormwater from its 0.8-acre industrial site through at least two discharge locations.  Defendants have certified that the receiving water for stormwater discharges from the Facility is the Arthur Kill.

90.     The Facility receives construction and demolition debris, and stores and processes these waste materials.  The majority of activity and storage at the Facility takes place outdoors,

where pollutants are exposed to stormwater.

91.     When it rains, the majority of stormwater from the Facility comes from, or is commingled with runoff from, areas at the Facility where industrial processes occur.

92.     Stormwater flowing over areas of the Facility that are associated with Defendants' industrial activities collects a variety of pollutants, including but not limited to sizeable debris, sediment, oil and grease, metals, organic substances and chemicals that create chemical oxygen demand or alter the pH of receiving waters, and other pollutants.

93.     Stormwater discharged from the Facility flows overland into the Arthur Kill and/or into a municipal storm drain that discharges to the Arthur Kill.  The Arthur Kill is a water of the United States.

**Defendants' General Permit Coverage**

94.     Defendants recently applied for and obtained coverage for the Facility under the General Permit via a Notice of Intent ("NOI") to comply with the terms of the General Permit that Defendants submitted to the DEC.

95.     Defendants were issued the SPDES identification number NYR00G375, with an effective coverage date of May 22, 2020.

**Defendants Discharge Excessively Polluted Stormwater**

96.     Defendants have taken samples or arranged for samples to be taken of stormwater discharges from the Facility.  The sample results were either reported to the DEC on written discharge monitoring reports or to the EPA and DEC jointly through EPA's electronic system for submission of discharge monitoring reports online.  Defendants certified each of those reports pursuant to the General Permit.

97.     In these stormwater sampling results, the Facility has consistently reported high pollutant levels that exceed applicable benchmarks and are evidence of ongoing violations of the

effluent limitations set forth in the General Permit.

Benchmark Exceedances

98.     In the past five years, the Facility has reported numerous discharges of stormwater from the Facility that exceeded the General Permit's benchmarks, including TSS, oil and grease, iron, aluminum, copper, lead, zinc, cadmium, chromium, and COD.

99.     The level of TSS in stormwater detected by the Facility has exceeded the cut-off concentration for TSS of 100 mg/L established by the DEC.  In the first half of 2021, the level of TSS measured at at one of the Facility's outfalls was 43,600 mg/L, which is 436 times the cut-off concentration.

100.     The level of oil and grease in stormwater detected by the Facility has exceeded the cut-off concentration for oil and grease of 15 mg/L established by the DEC.  In the first half of 2021, the level of oil and grease measured at as one of the Facility's outfalls was 37.2 mg/L, which is over 2 times the cut-off concentration.

101.     The levels of iron in stormwater detected by the Facility have exceeded the cut-off concentration for iron of 1 mg/L established by the DEC.  For example, in the second half of 2020, the level of iron measured at one of the Facility's outfalls was 21,500 mg/L.  Defendants also have measured levels of iron in excess of 1 mg/L in nearly every stormwater discharge from the Facility since the Facility's General Permit coverage has been active..

102.     The levels of aluminum in stormwater detected by the Facility have exceeded the cut-off concentration for aluminum of 750 μg/L established by the DEC.  For example, in the second half of 2021, the level of aluminum measured at one of the Facility's outfalls was 60,200 μg/L, which is over 80 times the cut-off concentration.  Defendants have measured levels of aluminum in excess of 750 μg/L in every stormwater discharge from the Facility since the

Facility's General Permit coverage has been active.

103.     The levels of copper in stormwater detected by the Facility have exceeded the cut-off concentration for copper of 12 µg/L established by the DEC.  For example, in the first half of 2021, the level of copper measured at one of the Facility's outfalls was 283 µg/L, which is over 23 times the cut-off concentration.  Defendants have measured levels of copper in excess of 12 µg/L in every stormwater discharge from the Facility since the Facility's General Permit coverage has been active..

104.     The levels of lead in stormwater detected by the Facility have exceeded the cut-off concentration for lead of 69 µg/L established by the DEC.  For example, in the first half of 2021, the level of lead measured at one of the Facility's outfalls was 409 µg/L, which is more than 5 times the cut-off concentration.  Defendants also have measured levels of lead in excess of 69 µg/L in nearly every stormwater discharge from the Facility since the Facility's General Permit coverage has been active..

105.     The levels of zinc in stormwater detected by the Facility have exceeded the cut-off concentration for zinc of 110 µg/L established by the DEC.  For example, in the first half of 2021, the level of zinc measured at one of the Facility's outfalls was 2,210 µg/L, which is over 20 times the cut-off concentration.  Defendants also have measured levels of zinc in excess of 110 µg/L in every stormwater discharge from the Facility since the Facility's General Permit coverage has been active.

106.     The levels of cadmium in stormwater detected by the Facility have exceeded the cut-off concentration for cadmium of 1.8 µg/L established by the DEC.  For example, in the first half of 2021, the level of cadmium measured at one of the Facility's outfalls was 5.85 µg/L, which is over 3 times the cut-off concentration.  Defendants also have measured levels of

cadmium in excess of 1.8 µg/L in nearly every stormwater discharge from the Facility since the Facility's General Permit coverage has been active.

107.     The levels of chromium in stormwater detected by the Facility have exceeded the cut-off concentration for cadmium of 1.8 mg/L established by the DEC.  For example, in the second half of 2020, the level of chromium measured at outfall 002 was 132 mg/L, which is over 73 times the cut-off concentration.  Defendants also have measured levels of chromium in excess of 1.8 mg/L in stormwater discharged from outfall 001 during the second half of 2020.

108.     The levels of COD in stormwater detected by the Facility have exceeded the cut-off concentration for COD of 120 mg/L established by the DEC.  For example, in the first half of 2021, the level of COD measured at one of the Facility's outfalls was 4,800 mg/L, which is 40 times the cut-off concentration.  Defendants also have measured levels of COD in excess of 120 mg/L in every stormwater discharge from the Facility since the Facility's General Permit coverage has been active.

109.     These benchmark exceedances are evidence of ongoing violations of the non-numeric effluent limitations set forth in the General Permit at the Facility.

<u>Violations of Water Quality Standards</u>

110.     In stormwater sampling results, the Facility has also consistently reported high pollutant levels that Baykeeper alleges cause or contribute to violations of applicable New York water quality standards.

111.     Since May 22, 2020, the Facility has reported numerous discharges of stormwater from the Facility that exceeded applicable New York water quality standards for Class SD waters, including copper (A(A)), lead (A(A), and zinc (A(A)).

112.     The levels of copper in stormwater detected by the Facility have exceeded the

water quality standard established by DEC of 4.8 µg/L for copper (A(A)).  For example, in the first half of 2021, the level of copper measured was 283 µg/L, which is over 58 times the standard.  Defendants have measured levels of copper in excess of 4.8 µg/L in stormwater discharged during the second half of 2020 and the first half of 2021.

113.    The levels of lead in stormwater detected by the Facility have exceeded the water quality standard established by DEC of 204 µg/L for lead (A(A)).  For example, in the first half of 2021, the level of lead measured was 409 µg/L, which is more than 2 times the standard. Defendants also have measured levels of lead in excess of 204 µg/L in stormwater discharged during the second half of 2020.

114.    The levels of zinc in stormwater detected by the Facility have exceeded the water quality standard established by DEC of 95 µg/L for zinc (A(A)).  For example, in the first half of 2021, the level of zinc measured was 2,210 µg/L, which is over 23 times the standard. Defendants also have measured levels of zinc in excess of 95 µg/L in stormwater discharged during the second half of 2020 and the first half of 2021.

115.    Additionally, Plaintiff alleges that Defendants' discharges of stormwater with COD at levels greatly exceeding the General Permit's benchmarks cause and/or contribute to the ongoing violation of the water quality standard for dissolved oxygen in the Arthur Kill.

116.    As mentioned above, Arthur Kill is impaired water for excessive oxygen demand (and thus low dissolved oxygen in the water).  As a Class SD water, the Arthur Kill meant to be suitable for fishing and for fish, shellfish, and wildlife survival, as well as for potential use for primary and secondary contact recreation.  6 N.Y.C.R.R. § 701.14.  To maintain these uses, New York requires that dissolved oxygen levels must exceed 3.0 mg/L at all times.  *Id.* § 703.3.  This is the lowest allowable level of dissolved oxygen at any time in any waterbody in the state.  The

Arthur Kill does not attain even this level of dissolved oxygen.

117.     The level of oxygen in a waterbody is measured, reported and regulated by measuring the waterbody's level of dissolved oxygen.  In contrast, the impacts upon a waterbody of pollutants that remove oxygen from it are measured as "chemical oxygen demand" (or, in some cases, biological oxygen demand). *See, e.g.*, General Permit, Appendix G (identifying "Chemical Oxygen Demand" as a measure of pollution associated with low dissolved oxygen.")*.*

118.     Chemical oxygen demand is a parameter that Sector N facilities are required to monitor.  General Permit, Part VII.  Because the Arthur Kill is impaired, Defendant is required to monitor chemical oxygen demand in its discharges quarterly.  *Id.*, Part IV.F.2.

119.     Both dissolved oxygen and chemical oxygen demand are measured in milligrams/liter (mg/L).  However, they measure two different (but related) things: dissolved oxygen measures of the *stock of oxygen* found in a waterbody; chemical oxygen demand measures the *reduction to that stock* of oxygen that the incoming pollution is likely to cause as it sets off various chemical reactions.

120.     Thus, the chemical oxygen demand of Defendants' industrial stormwater discharges to the Arthur Kill is a measure of how much oxygen will be consumed from the Arthur Kill's stock of dissolved oxygen by the incoming stormwater.

121.     A waterbody impaired by low dissolved oxygen has, by definition, an inadequate stock of dissolved oxygen to support aquatic life.  Since it already lacks an adequate stock of oxygen, the waterbody lacks the capacity to absorb stormwater discharges with high chemical oxygen demand.

122.     Thus, when Defendant discharges stormwater with high levels of chemical oxygen demand into the dissolved oxygen-impaired Arthur Kill, the discharge contributes to the

ongoing violation of water quality standards applicable to that waterbody.

**Defendants' Inadequate Stormwater and Pollution Management Practices**

123.    On information and belief, Baykeeper alleges that Defendants have failed and are continuing to fail to implement pollution controls equivalent to the BAT/BCT standard at the Facility for its discharges of industrial stormwater containing metals, oxygen-depleting chemicals, pH-altering chemicals, TSS and particulate matter, and other pollutants.  The Facility has failed to implement adequate BMPs; management practices at the Facility are inadequate to minimize pollution in industrial stormwater discharged to waters of the United States.  The Facility lacks sufficient structural controls such as grading, berming, roofing, containment, or drainage structures to prevent precipitation and stormwater flows from coming into contact with exposed areas of contaminants.  The Facility lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Facility lacks adequate stormwater pollution treatment technologies to treat stormwater once contaminated.

124.     On information and belief, Baykeeper alleges that track-out pollution (pollution carried on and falling off vehicles and their tires) is found on Defendants' access roadways and near the entrances/exits to the Facility.  Stormwater washes these pollutants into the Arthur Kill and into storm drains that discharge into the Arthur Kill.

125.    Based on the inadequacy of pollution prevention practices and the repeated exceedances of benchmarks and water quality standards, Baykeeper alleges that since at least May 22, 2020, Defendants have failed to implement BAT and BCT at the Facility for its discharges of TSS, oil and grease, iron, aluminum, copper, lead, zinc, cadmium, chromium, and COD.  As of the date of this Complaint, Defendants have failed to implement BAT and BCT at the Facility.

126.    Further detailed facts, including additional detail on specific incidents and

conditions that constitute violations of the General Permit, are set forth in the Notice Letter attached hereto as Exhibit A, and are incorporated herein by reference.

<u>Inadequate SWPPP</u>

127.     On information and belief, Baykeeper alleges that Defendants have not implemented an adequate SWPPP for the Facility.  Baykeeper is informed and believe, and thereupon alleges, that the SWPPP for the Facility does not set forth adequate site-specific BMPs, such as housekeeping measures, or adequate structural control measures to be consistent with BAT or BCT for the Facility, and to meet the General Permit's requirement to minimize pollutant discharges.

128.     Further, on information and belief, Baykeeper alleges that Defendants have failed to keep the SWPPP for the Facility current by amending them whenever there are changes in design, construction, operation, or maintenance at the Facility that affect the potential to discharge pollutants, or whenever the SWPPP has been found to be ineffective in eliminating or significantly minimizing pollutants.

129.     In the Notice Letter attached hereto as Exhibit A, sent on June 3, 2021, Baykeeper requested a copy of Defendants' most recent SWPPP.

130.     The General Permit requires permittees to provide a copy of the SWPPP within 14 days of a written request.  General Permit, Part III.C.2.

131.     As of the filing of this complaint, Baykeeper has not received a copy of Defendants' most recent SWPPP.

<u>Inadequate Corrective Actions</u>

132.     On information and belief, Baykeeper alleges that Defendants have failed to implement sufficient corrective actions, as evidenced by the Facility's continued stormwater

sample results with exceedances of applicable benchmarks and with the reasonable potential to cause or contribute to a violation of water quality standards, as set forth in Exhibit A, § II.B, and incorporated by reference.

### Defendants' Inadequate Monitoring, Inspection, and Reporting Practices

133.     As discussed above, the General Permit requires permittees, including Defendants, to conduct regular inspections of stormwater controls, to monitor stormwater discharges, and to take corrective action where the Facility's BMPs and SWPPP are deemed insufficient to minimize the exposure of stormwater to pollution.  Defendants are also required to submit certain reports of these inspection and monitoring procedures to DEC, and to keep all appropriate documentation of these procedures with the SWPPP for five years.

134.     Since obtaining General Permit coverage on May 22, 2020, Defendants have been required to submit Annual Comprehensive Reports ("ACRs") to DEC.  Baykeeper is informed and believes, and thereupon alleges that, as of the filing of this Complaint, Defendants have not submitted the Annual Comprehensive Report for 2020 to DEC, which was due on January 28, 2021.

135.     On information and belief, Baykeeper alleges that Defendants have failed to submit the required corrective action forms for stormwater discharges that exceeded benchmarks for COD at the Facility during 2020 and 2021, as set forth in Exhibit A, § II.E., and incorporated by reference.

136.     On information and belief, Baykeeper alleges that all of the events and circumstances described above have occurred continuously since at least May 22, 2020.

137.     Information available to Baykeeper indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated stormwater.  Baykeeper is informed and believes, and

thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

138.   Further detailed facts, including additional detail on specific dates of incidents and conditions that constitute violations of the General Permit, are set forth in the Notice Letter that is attached to this Complaint as Exhibit A and are incorporated by reference.

## VI.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
**Failure to Implement the Best Available and Best Conventional Treatment Technologies
(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

139.   Baykeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

140.   Parts II.D and VII of the General Permit, , requires Defendant to implement mandatory general and sector-specific control measures and BMPs to minimize the discharge of pollutants from the Facility.

141.   Because the industrial activities carried out at the Facility are categorized in SIC Code 5093, Defendant must implement the sector-specific control measures specified in Part VII of the General Permit for Sector N.

142.   Baykeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not implemented adequate control measures or BMPs required by the General Permit.

143.   The pollution prevention and control measures selected to comply with Parts II.D and VII.N of the General Permit must meet the federal BAT/BCT Standard.

144.   Defendants have failed to implement control measures that meet the BAT/BCT Standard at the Facility for its discharges of stormwater associated with industrial activity

containing TSS, oil and grease, iron, aluminum, copper, lead, zinc, cadmium, chromium, and COD in violation of Parts II and VII of the General Permit.

145.    The failure to implement sufficient BMPs that meet the BAT/BCT standard is evidenced by, amongst other things, the Facility's repeated benchmark exceedances and violations of water quality standards, and the visible track-out found on Defendants' access roadways and near the entrances/exits to the Facility.

146.    On information and belief, Defendants have failed to develop and implement pollution controls equivalent to the BAT/BCT Standard every day since at least May 22, 2020.

147.    Each day upon which Defendants operate the Facility without pollution controls equivalent to the BAT/BCT Standard is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

<u>SECOND CAUSE OF ACTION</u>
**Causing or Contributing to Violations of Water Quality Standards**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

148.    Baykeeper re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

149.    The General Permit states that "[i]t shall be a violation of the Environmental Conservation Law (ECL) for any discharge authorized by this general permit to either cause or contribute to a violation of water quality standards as contained in 6 NYCRR Parts 700–705." General Permit, Water Quality Based Effluent Limitation II.C.1.a.

150.    Baykeeper is informed and believes, and thereupon alleges, that since at least May 22, 2020, Defendants have been discharging polluted stormwater from the Facility in excess of

the applicable water quality standards for copper, lead, zinc, and COD in violation of Water Quality Based Effluent Limitation II.C.1.a of the General Permit.

151.    During every rain event, stormwater flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with pollutants at levels above applicable water quality standards.  The stormwater from the Facility flows untreated overland into the Arthur Kill and/or into a municipal storm drain that flows into the Arthur Kill.

152.    Baykeeper is informed and believes, and thereupon alleges, that these discharges of contaminated stormwater are causing or contributing to the violation of the applicable water quality standards in 6 NYCRR Parts 700–705 in violation of Water Quality Based Effluent Limitation II.C.1.a of the General Permit.

153.    Every day since at least May 22, 2020 that Defendants have discharged and continue to discharge polluted stormwater from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
**Failure to Develop, Implement, and Maintain an Adequate SWPPP**
**(Violations of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311 and 1342)**

154.    Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

155.    Part III of the General Permit requires industrial dischargers to develop, implement, and maintain compliance with a Stormwater Pollution Prevention Plan.

156.    The SWPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the discharger's industrial activity.

157.    Further, the SWPPP must describe how the discharger has implemented BMPs to minimize the discharge of pollutants in stormwater and to assure compliance with the other terms and conditions of the General Permit, including achievement of effluent limitations.

158.    The SWPPP must address, at a minimum: (1) each of the universally applicable elements set forth in Part III.A of the General Permit; (2) each of the applicable sector-specific plan elements specified in Part VII of the General Permit, *see* Part III.A.7; and, (3) as applicable, additional special requirements listed in Part III.D of the General Permit for discharges through a municipal separate storm sewer or discharges to impaired waterbodies.  Each of these elements also require the discharger to maintain records and documentation of compliance with each of these elements.

159.    The SWPPP must be representative of current site conditions and kept up to date. General Permit, Part III.E.

160.    Defendants have failed to develop, implement and keep up to date an adequate SWPPP for the Facility.  The inadequacy of the SWPPP is evidenced by, *inter alia*, the inadequate stormwater control measures and BMPs at the Facility and by the Facility's continuing discharges of excessively polluted stormwater.

161.    Defendants have failed to update the SWPPP for the Facility in response to the analytical results of the Facility's stormwater monitoring.

162.     On information and belief, Defendants have failed to develop and implement an adequate SWPPP for the Facility every day since at least May 22, 2020.

163.    Each day upon which Defendants operate the Facility without an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and CWA

Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## FOURTH CAUSE OF ACTION
### Failure to Provide a Copy of the Stormwater Pollution Prevention Plan
### (Violation of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

164.    Baykeeper re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

165.    In the Notice Letter attached hereto as Exhibit A, sent on June 3, 2021, Baykeeper requested a copy of Defendants' most recent SWPPP.

166.    The General Permit requires permittees to provide a copy of the SWPPP within fourteen days of a written request.  General Permit, Part III.C.2.

167.    As of the filing of this complaint, Baykeeper has not received a copy of Defendants' most recent SWPPP.

168.    Defendants have been in violation of this requirement of the General Permit every day since June 17, 2021.  Defendants continue to be in violation of this requirement each day that it fails to provide a copy of its updated SWPPP.

169.    Each day upon which Defendants fail to provide a copy of their updated SWPPP for the Facility is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### Failure to Take Corrective Actions
### (Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)

170.    Baykeeper re-alleges and incorporates all preceding paragraphs as fully set forth herein.

171.    Under the General Permit, when a permittee learns of an effluent limit violation, said permittee must document such behavior and take corrective actions.  General Permit, Parts IV.A.1.b, IV.B.4, IV.C.3, IV.E.6, V.

172.    Documentation of such violation must record the issue causing this violation, the date said issue was discovered, and the corrective action being taken, amongst other things.  *Id*., Part V.C (citing Appx H.8).

173.    Baykeeper is informed and believes, and thereupon alleges that, as of the filing date of this complaint, Defendants have not taken adequate corrective actions to address their ongoing violations.  This failure is evidenced by Defendants' repeated benchmark exceedances and violations of water quality standards, and the visible track-out found on Defendants' access roadways and near the entrances/exits to the Facility.

174.    Each and every day since May 22, 2020 on which Defendants fail to comply with any of the General Permit's corrective action requirements is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

**SIXTH CAUSE OF ACTION**
**Failure to Record and Make Accurate Reports**
**(Violations of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342)**

175.    Baykeeper re-alleges and incorporates all preceding paragraphs as fully set forth herein.

176.    Under the General Permit, Defendants must inspect the Facility, monitor discharges, and accurately report their findings to DEC and/or maintain a record of their findings with their SWPPP.  General Permit, Parts IV, VI, Apps. H.8.g, H.9.  This includes submitting Annual Comprehensive Reports and Periodic Discharge Monitoring Reports to DEC.  *Idi.*, Parts VI.A.1, 2.

177.    Baykeeper is informed and believes, and thereupon alleges that, as of the filing of this Complaint, Defendants have not submitted an Annual Comprehensive Report for 2020 to DEC.

178.    Each and every day since January 28, 2021, the date when the Annual Comprehensive Report for 2020 was due, on which Defendants fail to comply with any of the General Permit's reporting and recordkeeping requirements is a separate and distinct violation of the General Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342.  These violations are ongoing and continuous.

## VII.

## PRAYER FOR RELIEF

179.    Wherefore, Baykeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.   Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facility except as authorized by and in compliance with the General Permit;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.   Order Defendants to comply with the General Permit's inspection, monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendants to prepare a SWPPP for the Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendant to provide Baykeeper with reports documenting the quality and

quantity of their discharges to waters of the United States and their efforts to comply

with the Act and the Court's orders;

h.   Order Defendants to pay civil penalties of up to $56,460 per day per violation,

pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and

40 C.F.R. §§ 19.1 - 19.4;

i.   Order Defendant to take appropriate actions to restore the quality of waters

impaired or adversely affected by their activities;

j.   Order Defendant to pay the costs of litigation, including Baykeeper's reasonable

investigative costs, attorney fees, expert witness and consultant fees, and other costs,

pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

k.   Award any such other and further relief as this Court may deem appropriate.


Dated this 13th day of October 2021          Respectfully submitted,
New York, New York


                                             By:  /s/ Edan Rotenberg

                                             Edan Rotenberg
                                             SUPER LAW GROUP, LLC
                                             110 Wall Street
                                             New York, NY 10005
                                             *Attorney for Plaintiff*